UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

LASH AUTO GROUP I, LLC d/b/a LASH KIA
OF WHITE PLAINS,

                Case No.: 7:13-cv-02543-CS

            Plaintiff,

    - against -

KIA MOTORS AMERICA, INC.,

            Defendant.
---------------------------------------------------------------X


**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO VACATE STATUTORY STAY**


                HOGAN LOVELLS US LLP
                John J. Sullivan
                875 Third Avenue
                New York, New York  10022
                Telephone:  (212) 918-3000
                Facsimile:  (212) 918-3100

                *Attorneys for Defendant
                Kia Motors America, Inc.*

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Table of Authorities | ii |
| **PRELIMINARY STATEMENT** | 1 |
| **BACKGROUND** | 3 |
|     A. Lash's Unauthorized Relocation of Its Kia Service Operations | 3 |
|     B. The Asset Purchase Agreement Between Lash and Aaronson | 4 |
|     C. Lash Goes Out of Business | 5 |
|     D. Harm to The Public and KMA | 6 |
| **SUMMARY OF ARGUMENT** | 8 |
| **ARGUMENT** | 9 |
| I. THE STAY NO LONGER SERVES ITS INTENDED PURPOSE | 9 |
| II. THIS COURT HAS THE AUTHORITY TO GRANT RELIEF FROM THE STAY | 11 |
| III. THE EQUITIES STONGLY FAVOR LIFTING THE STATUTORY STAY | 13 |
| **CONCLUSION** | 15 |

\\NY - 029013/000410 - 3000135 v2

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

Am. Home Assur. Co. v. Am. Fid., 261 F. Supp. 734 (S.D.N.Y. 1966) ........................................11

American Suzuki Motor Corp. v. Bill Kummer, Inc., 65 F.3d 1381 (7th Cir. 1995) ..............10, 11

Hecht Co. v. Bowles, 321 U.S. 321 (1944)...............................................................................11, 12

Jacobson & Co. v. Armstrong Cork Co.,
    548 F.2d 538 (2d Cir. 1977)......................................................................................................13

Long v. State,
    7 N.Y. 3d 269 (2006) ................................................................................................................11

McNamee, Lochner, Titus & Williams, P.C. v. Higher Educ. Assist. Found.,
    50 F.3d 120 (2d Cir. 1995)........................................................................................................14

People v. Santi,
    3 N.Y. 3d 234 (2004) ................................................................................................................11

Porter v. Warner Holding Co., 328 U.S. 395 (1946) .....................................................................12

Ripley v. International Railways, 8 A.D.2d 310, 188 N.Y.S.2d 62 (1st Dep't 1959), aff'd,
    8 N.Y.2d 430 (1960). ................................................................................................................11

Standard & Poor's Corp. v. Commodity Exch., Inc.,
    683 F.2d 704 (2nd Cir. 1982)....................................................................................................13

State v. Barone, 74 N.Y.2d 332 (1989) .........................................................................................11

Wechsler v. Wechsler, 8 Misc.3d 328, 797 N.Y.S.2d 844 (Sup. Ct. N.Y.Co. 2005) .....................12

Weinberger v. Carlos Romero-Barcelo,
    456 U.S. 305 (1982)............................................................................................................11, 12

**STATUTES**

N.Y. Veh. & Traf. L. § 460 et seq. ..................................................................................................1

N.Y. Veh. & Traf. L. § 463(2)(d)(3)(ii)...........................................................................................6

N.Y. Veh. & Traf. L. § 463(2)(e)(1) ........................................................................1, 4, 8, 9, 10, 12

N.Y. Veh. & Traf. L. § 469(1).........................................................................................................4

**OTHER AUTHORITIES**

55 N.Y. Jur. 2d Equity § 77 ................................................................................................12

\\NY - 029013/000410 - 3000135 v2

Defendant Kia Motors America, Inc. ("KMA") respectfully submits this motion to vacate the statutory stay imposed by N.Y. Veh. & Traf. L. § 463(2)(e)(1).

## PRELIMINARY STATEMENT

Plaintiff Lash Auto Group 1 LLC ("Lash") has brought this action to challenge: (i) KMA's refusal to consent to a proposed transfer of Lash's Kia dealership to Josh Aaronson; and (ii) two termination notices, dated February 1, 2013 and September 30, 2013, by which KMA advised Lash of its intent to terminate the parties' Kia Dealer Sales and Service Agreement (the "Dealer Agreement").

After receiving the February 1, 2013 notice ("First Notice of Termination"), Lash filed this action on April 17, 2013, alleging (among other things) that KMA does not have "due cause" for termination, as required by the Franchised Motor Vehicle Dealer Act, N.Y. Veh. & Traf. L. ("VTL") § 460 et seq. (the "Act"). The filing of Lash's initial Complaint (the "Original Complaint") triggered an automatic stay of the proposed termination under § 463(2)(e)(1) of the Act. The purpose of the automatic stay is to allow the dealer to remain in business while challenging the franchisor's attempt to terminate. But here, Lash has gone out of business. It closed its doors and discontinued its Kia sales and service operations no later than September 2013.

Both the Dealer Agreement and the Act make failure to conduct customary sales and service operations for seven (7) consecutive business days a ground for expedited termination of a franchise. In light of the seriousness of the breach, the Act establishes a 15-day notice period for termination on this specific ground (rather than the 90 days normally required). KMA's notice of termination dated September 30, 2013 ("Second Notice of Termination") cited the

1

abandonment ground and advised Lash that termination would become effective 15 days after receipt of the notice.

As shown below, the Court should vacate the automatic stay and allow the termination of the Dealer Agreement to become effective.  Because Lash has discontinued all of its Kia sales and service operations, the stay no longer serves its intended purpose.  Worse, the stay is likely to mislead and inconvenience the public, because it arguably prevents KMA from removing Lash from its website and from requiring Lash to remove all Kia signage from its premises.  As a result, owners of Kia vehicles and other consumers are likely to visit Lash's former Kia dealership facilities for service and sales, only to find that the dealership is closed.  Meanwhile, KMA is losing the goodwill of its customers as well as a substantial but indeterminate amount of sales of vehicles, parts and accessories in the White Plains market.  Moreover, unless and until the stay is lifted, KMA will not be able to appoint a replacement White Plains dealer.  This restriction is depriving local Kia vehicle owners and other customers of a convenient place for Kia sales and service (including the free warranty service to which Kia vehicle owners are entitled).  The restriction also serves no purpose because Lash is not seeking to be reinstated as a Kia dealer; notwithstanding the prayer for relief in Lash's First Amended Complaint (the "Complaint"), as a practical matter the only remedy now available to Lash is money damages.

Accordingly, the automatic stay should be lifted and KMA should be permitted to appoint a new Kia dealer in White Plains.

# BACKGROUND[1]

A. <u>Lash's Unauthorized Relocation of Its Kia Service Operations</u>

Lash and KMA are parties to a Kia Dealer Sales and Service Agreement executed in September 2010.  [Dougherty Decl., ¶ 2 and Ex. A (the "Dealer Agreement").]  The Dealer Agreement authorizes Lash to conduct its Kia sales operations at an exclusive facility located at 388 Tarrytown Road, White Plains, New York 10607, and to conduct Kia service operations at an exclusive facility at 76 E. Main Street, Elmsford, New York 10607.  [Id., ¶ 4 and Ex. A, Part 1, ¶ III.]  The Dealer Agreement does not permit Lash to "establish or conduct any Kia dealership operations . . . including without limitation the display, sale or servicing of Kia Products, or display the Kia Marks at any facility or location other than those identified."  [Id., ¶ 4 and Ex. A, Standard Provisions, Paragraph VI.]

By letter dated August 3, 2012, KMA advised Lash that it was in breach of the Dealer Agreement because, among other things, Lash (i) was conducting certain Kia service operations in the facilities of Lash Volkswagen of White Plains (the "VW Dealership") at 376 Tarrytown Road in White Plains; and (ii) was not complying with its obligation to employ an agreed number of exclusive parts and service personnel in its Kia parts and service operations.  KMA demanded that Lash cure these and certain other breaches of the Dealer Agreement, including Lash's abysmal customer satisfaction scores.  [Dougherty Decl., ¶ 6 and Ex. B.]

Lash, however, failed to cure its breaches.  Moreover, in January 2013, KMA discovered that Lash was distributing a flyer to its Kia customers announcing that "we have opened a brand new state-of-the-art Service Facility with Certified KIA Factory Trained Technicians" and listing the address of Lash's new VW service facility as the location of the "Lash Kia Service

---

[1] KMA's motion is based on the Declaration of Melanie Dougherty, dated December 19, 2013 ("Dougherty Decl."), and the Affidavit of John J. Sullivan, sworn to January 15, 2014 ("Sullivan Aff.").

3

Department." This announced relocation of the Kia service department was not authorized by KMA and constituted yet another serious breach of the Dealer Agreement relating to Lash's Kia service operations. [Dougherty Decl., ¶ 7 and Ex. C.]

On February 1, 2013, KMA issued the First Notice of Termination, notifying Lash that KMA was terminating the Dealer Agreement for, among other things, Lash's "attempts to conduct any Kia dealership operation other than at the approved locations" and its continuing failure to provide exclusive, dedicated Kia service personnel. [Dougherty Decl., ¶ 9 and Ex. D.] Absent a challenge, the First Notice of Termination would have taken effect and terminated the Dealer Agreement 90 days after its receipt by Lash.

### B.   The Asset Purchase Agreement Between Lash and Aaronson

In November 2012, Lash submitted to KMA a proposed asset purchase agreement, dated November 12, 2012 (the "APA"), between Lash and Josh Aaronson. By letter dated January 14, 2013, KMA advised Lash and Aaronson that it could not approve the proposed transfer of the dealership because, among other reasons, Aaronson's facility proposal would not meet KMA's minimum facility standards. [Dougherty Decl., ¶¶ 10-11.]

Following the January 14, 2013 letter, KMA entered into discussions with Aaronson concerning KMA's objections to the proposed transfer and the possible terms and conditions under which KMA would be willing to approve the APA. These discussions began before this lawsuit was filed. [Id., ¶ 12.]

Lash filed the Original Complaint, challenging KMA's rejection of the APA and its issuance of the First Notice of Termination, on April 17, 2013. That filing triggered an automatic stay of termination. Section 463(2)(e)(1) of the Act provides that, if an action is commenced under § 469 of the Act "within four months of receipt of [the] notice [of

4

termination], such action shall serve to stay, without bond, the proposed termination . . . until the final judgment has been rendered . . . ."

The discussions between the parties continued after this lawsuit was filed. [Dougherty Decl., ¶¶ 12-13; Sullivan Aff., ¶ 7.] While those discussions were ongoing, Lash notified KMA, via a letter from Lash's counsel dated April 24, 2013, that Lash intended to close its doors and voluntarily terminate the Dealer Agreement as of May 1, 2013. [Sullivan Aff., ¶¶ 2, 3 and Ex. 1.] After KMA reminded Lash that the Dealer Agreement required 30 days' notice of a voluntary termination, Lash's counsel sent a new letter, dated April 30, 2013, advising KMA that Lash would voluntarily terminate 30 days following the April 30, 2013 letter. [Id., ¶¶ 4-5 and Ex. 2.] On May 30, 2013, however, Lash advised KMA that it was "adjourn[ing]" the voluntary termination while waiting for the parties to finalize a settlement. [Id., ¶ 8.]

In late July 2013, KMA entered into an agreement with Aaronson pursuant to which KMA agreed to approve the proposed transfer. KMA also entered into a settlement of this dispute with Lash, which was conditioned on the closing of the asset purchase agreement between Lash and Aaronson. [Dougherty Decl., ¶ 13.]

The closing was scheduled to take place on September 3, 2013. KMA was advised that day, however, that the transaction had failed to close because of an issue arising between Lash and Aaronson at the closing. [Id., ¶ 14.]

    C.    **Lash Goes Out of Business**

Following the aborted closing, KMA learned that Lash had closed its doors and had completely discontinued all of its Kia operations. [Id., ¶ 15.] By letter dated September 17, 2013, KMA reminded Lash that the Dealer Agreement was still in effect and that Lash was required to continue performing customary Kia sales and service operations. [Id., ¶ 16 and Ex. E.] KMA also requested that Lash confirm, by September 25, 2013, that it had resumed

5

customary Kia operations. [Id.] KMA, however, received no communication from Lash of any kind by September 25. [Id., ¶ 17] The following day, a KMA representative visited Lash's authorized locations and found them locked and unattended. [Id., ¶ 18]

Lash's abandonment of its Kia operations constituted a breach of the Dealer Agreement that entitled KMA to terminate for "fail[ure] to conduct customary dealership operations for seven (7) consecutive business days." [Dougherty Decl., ¶ 19, and Ex. A, Standard Provisions, ¶ XII.C.1.c.] The Act also allows termination for "the failure of the franchised motor vehicle dealer to conduct its customary sales and service operations for a continuous period of seven business days, except for acts of God or circumstances beyond the direct control of the franchised motor vehicle dealer." N.Y. Veh. & Traf. L. § 463(2)(d)(3)(ii). Because of the seriousness of dealer abandonment, the Act provides for a 15-day notice period (rather than the typical 90-day notice period) before a termination takes effect. Id.

On September 30, 2013, KMA sent Lash the Second Notice of Termination based on Lash's failure to conduct customary Kia sales and service operations for a continuous period of at least seven consecutive business days. [Dougherty Decl., ¶ 20 and Ex. F.]

On October 30, 2013, Lash filed its First Amended Complaint (the "Complaint"), which added a challenge to the Second Notice of Termination. Notably, Lash did not allege that it had (i) continued Kia sales and service operations without an interruption of at least seven consecutive business days, or (ii) resumed customary business operations after receiving the Second Notice of Termination.

      D.      **Harm to The Public and KMA**

Despite Lash's abandonment of its Kia operations, the automatic stay requires KMA to continue to treat Lash as an authorized Kia dealer. This requirement is having serious negative effects on Kia customers, and potential customers, and on KMA itself.

6

For example, Lash continues to be listed as an authorized dealer on Kia's official website, www.Kia.com. Consumers use the "Find Dealer" feature on this website to find the Kia dealer closest to them. In addition, because Lash is still an authorized dealer, KMA is unable to require Lash to remove the Kia signage from its abandoned facilities and/or to discontinue other uses of the Kia trademarks. Consumers are likely to be misled by such listings and/or signage into believing that Lash is still an operating Kia dealership, and to visit the Lash showroom or service facility, only to find that they are closed. [Dougherty Decl., ¶ 22.]

In addition to causing unnecessary inconvenience and expense to consumers, any consumers who are misled are likely to blame KMA for what they will consider to be misinformation about the status of Lash. The result is likely to be substantial consumer anger and bad will against KMA. Attached to the Dougherty Declaration are examples of reports of consumer complaints to KMA concerning the failure of Lash to respond to customer inquiries, the failure of KMA to notify customers of the closure of Lash, and the lack of an alternative, convenient Kia dealership in the White Plains area. [Id., ¶¶ 23-24 and Exs. G, H and I.]

The automatic stay prevents KMA from appointing a new dealer in the White Plains market to replace Lash and provide sales and service to existing Kia vehicle owners in the area, as well as to other consumers who are interested in purchasing a Kia. Existing Kia owners expect to have convenient, authorized service available for their vehicles, and owners whose vehicles are still under warranty are entitled to free warranty service. The closest Kia dealer is Yonkers Kia, which due to traffic and location is not convenient for customers in Northern Westchester. The next closest dealers are on the other side of the Hudson (West Nyack, across the Tappan Zee Bridge) and in Stamford, Connecticut. By contrast, most of KMA's competitors – including Honda, Hyundai, Nissan, Chrysler, and Ford – have authorized dealerships in White Plains.

Unless and until KMA is able to appoint a new dealer, many of Lash's former customers will not have convenient Kia sales and service operations available to them. [Dougherty Decl., ¶ 24.]

In addition, the stay is causing irreparable harm to KMA, not only in lost consumer goodwill (as described above) but also in a substantial but indeterminate amount of lost sales of new Kia vehicles, parts, and accessories. When Lash was appointed in 2010, it reasonably projected that it would sell 516 new Kia vehicles in its first year in the White Plains market. While Lash did not perform up to the market potential, in its first full calendar year of operation it did sell over 300 new Kia vehicles. [Dougherty Decl., ¶ 25.] Thus, it is apparent that KMA is losing a substantial amount of sales of new vehicles, parts, and accessories as a result of being excluded from the White Plains market by the combination of Lash's abandonment of its operations and the automatic stay.

Lash has not reported the sale of a new Kia vehicle since May 29, 2013. [Dougherty Decl., ¶ 26.] This is, perhaps not coincidentally, almost the exact date on which Lash told KMA that it planned to voluntarily terminate its Kia operations.  Once KMA loses a sale, it can never be recovered. The only way to prevent further loss of sales to KMA is to allow KMA to appoint a new dealer in the White Plains market to replace Lash.

## SUMMARY OF ARGUMENT

Lash is not entitled to the continuing protection of the statutory stay because Lash is no longer seeking to preserve an ongoing business.  In light of Lash's abandonment of its Kia operations, the only remedy that is now available for its alleged losses is, as a practical matter, money damages.  Section 463(2)(e)(1) of the Act was intended to stay any proposed termination so that both parties could continue to perform their dealership agreement during the pendency of the dealer's challenge to its termination.  The stay no longer serves that purpose in this case because Lash has breached the Dealer Agreement by ceasing customary Kia sales and service

8

operations.  As a result, the current situation – that KMA must abide by a Dealer Agreement whose performance Lash has completely abandoned – is contrary to fundamental principles of equity jurisprudence.  (Point I.)

The Court can grant relief from the statutory stay.  Equity jurisdiction allows courts to fashion a remedy to fit the needs of the cases before them.  This flexible equitable authority is not restricted by legislation unless the legislation clearly and expressly so provides.  There is no indication that the New York state legislature intended to deprive the Court of its equitable discretion to vacate or modify a statutory stay.  Although the stay was entered "automatically," neither the Act nor its legislative history says anything about restricting the Court's power to modify or vacate the stay once entered.  (Point II.)

The equities of this case strongly support the Court's exercise of its discretion to vacate the stay.  Continuation of the stay will cause consumers to be misled and to waste time and money traveling to a dealership that is no longer operating.  It will also prevent Kia vehicle owners from obtaining convenient Kia service (including free warranty service, to which they are entitled) for as long as the stay prevents KMA from appointing a replacement dealer in White Plains.  Meanwhile, KMA will suffer irreparable harm from the loss of sales and of customer goodwill.  By contrast, Lash will suffer no harm if the stay were lifted since it is no longer operating as a Kia dealer.  The harms Lash alleges in the Complaint can all be redressed, if Lash prevails in this action, by a monetary award.  (Point III.)

## ARGUMENT

### I.     THE STAY NO LONGER SERVES ITS INTENDED PURPOSE

By filing this action following the First Notice of Termination, Lash triggered the automatic stay under § 463(2)(e)(1) of the Act.  The stay, however, did not release Lash from its obligations under the Dealer Agreement.  To the contrary, the stay requires both the franchisor

9

and the franchisee to continue performing their obligations under the franchise agreement until final judgment.

This very point was forcefully made in <u>American Suzuki Motor Corp. v. Bill Kummer, Inc.</u>, 65 F.3d 1381 (7th Cir. 1995).  There, a Suzuki motorcycle dealer filed a complaint with a state agency challenging a termination notice under the Wisconsin dealer law.  <u>Id.</u> at 1384.  As under New York law, such a challenge "trigger[ed] an automatic stay provision requiring any dealer agreement to remain in effect until the [agency] reache[d] a final decision on the complaint."  <u>Id.</u>  Both parties "were therefore bound by the terms of the Dealer Agreement until the [agency] resolved the issues presented in [the dealer's] complaint."  <u>Id.</u>

Nevertheless, while the state administrative proceeding was pending, the dealer "just stopped stocking and selling Suzukis."  <u>Id.</u> at 1389.  Accordingly, even though the dealer prevailed in the state proceeding, the manufacturer issued a new notice of termination for the dealer's failure to perform during the pendency of that proceeding.  The Seventh Circuit upheld the new notice of termination.  Under the automatic stay, "[the manufacturer] was required to abide by the terms of the Dealer Agreement, *and so was* [the dealer]."  <u>Id.</u> (emphasis in original).  Because the dealer "was obligated to continue to use its best efforts to sell Suzuki motorcycles . . . the failure to do so constituted a breach of contract."  <u>Id.</u>

This analysis applies equally to the Act and to this case.  Section 463(2)(e)(1) automatically stayed termination of the Dealer Agreement, with both KMA and Lash to continue performance according to its terms.  For its part, Lash was bound to be open for business, conducting customary Kia sales and service operations, during normal business hours.  [See Dougherty Decl., ¶ 16 and Ex. A, Standard Provisions, ¶ IX.A.2.]  Lash, however, has ceased all performance.

10

Lash "cannot have it both ways." American Suzuki, 65 F.3d at 1389.  It was required to continue performing the Dealer Agreement under the protection of the automatic stay.  Having failed to do so, it should be held to have forfeited that protection.  To hold otherwise would require KMA to continue performing a contract that Lash has already stopped performing.  "It is well settled that [New York] courts should construe [statutes] to avoid objectionable, unreasonable or absurd consequences." Long v. State, 7 N.Y. 3d 269, 273 (2006); see People v. Santi, 3 N.Y. 3d 234, 242 (2004) (New York courts "'will not blindly apply the words of a statute to arrive at an unreasonable or absurd result'").  By halting its performance of the Dealer Agreement, Lash has negated the stay's purpose and, in fact, rendered it counterproductive.

## II.     THIS COURT HAS THE AUTHORITY TO GRANT RELIEF FROM THE STAY

The Court has the equitable power to grant relief from the statutory stay.  Historically, courts have had broad discretion to tailor equitable remedies to a particular case. Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."); Ripley v. International Railways, 8 A.D.2d 310, 328, 188 N.Y.S.2d 62, 82 (1st Dep't 1959) ("The flexibility of equitable jurisdiction permits innovation in remedies to meet all varieties of circumstances which may arise in any case."), aff'd, 8 N.Y.2d 430 (1960).  This feature of American law has its roots in English jurisprudence and has been enhanced by the "common-law process." State v. Barone, 74 N.Y.2d 332, 336 (1989).  It extends to situations where, as here, a party seeks to vacate an equitable stay previously imposed. American Home Assur. Co. v. American Fidelity, 261 F. Supp. 734, 735 (S.D.N.Y. 1966) (the court "retains broad equity powers to undo a stay found inequitable if prospectively enforced").

To be sure, a statute can restrict a court's traditional authority to fashion equitable relief.  But such limitations are disfavored. Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982)

11

("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.") (internal quotations and citations omitted).  For example, the Supreme Court has held that seemingly "mandatory" statutory language requiring the imposition of an injunction does not divest courts of equitable discretion.  Bowles, 321 U.S. at 328 (holding that a court retained the authority to grant or deny an injunction despite a statutory command that an injunction "shall be granted" under certain circumstances); see also Weinberger, 456 U.S. at 318 (denying an injunction to plaintiff notwithstanding statutory mandate).

Because the Act contains no language – mandatory or otherwise – addressing the Court's equitable authority to modify or vacate the stay, there is even less reason to read such a limitation into the Act.  See Wechsler v. Wechsler, 8 Misc.3d 328, 329, 797 N.Y.S.2d 844, 845 (Sup. Ct. N.Y.Co. 2005) (dictum) ("The fact that the stay is automatic does not remove it from the purview of the court's discretion to otherwise vacate, limit or modify the stay.").  Section 463(2)(e)(1) "serve[s] to stay . . . the proposed termination" under certain circumstances.  It does not prohibit the Court from exercising its discretion to modify or vacate that stay if equity so demands.  Statutory silence should not be sufficient to alter the Court's well-established equitable authority.  Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946) ("[T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command.").  There is also no legislative history suggesting that the automatic stay was intended to limit the Court's equitable jurisdiction.  Without either statutory text or legislative history on point, this Court should not restrict its equitable powers, especially when doing so would result in harm to consumers and injustice to KMA.  55 N.Y. Jur. 2d Equity § 77 ("Equity is to provide a remedy rather than suffer a wrong to be without remedy.").

### III.   THE EQUITIES STRONGLY FAVOR LIFTING THE STATUTORY STAY

The balance of the equities clearly weighs in favor of vacating the stay.  Consumers are being misled, inconvenienced, and caused to waste time and money because the stay requires KMA to conduct itself as if Lash were still an authorized Kia dealer with all of the rights and privileges of such a dealer.  [See pp. 6-8, supra; Dougherty Decl., ¶¶ 22-24 and Exs. G, H and I.]  Moreover, it is obviously in the public interest to establish a replacement Kia dealership in White Plains so that (i) White Plains consumers will have a broader range of competitive choices and (ii) existing Kia vehicle owners and lessees can get convenient service.  KMA is suffering irreparable harm from being excluded from the White Plains marketplace.  See Standard & Poor's Corp. v. Commodity Exch., Inc., 683 F.2d 704, 711-12 (2d Cir. 1982) (harm is irreparable where amount of lost sales is difficult to measure).

KMA is also suffering irreparable harm from the loss of customer good will.  See Jacobson & Co. v. Armstrong Cork Co., 548 F.2d 438, 444-45 (2d Cir. 1977) ("threatened loss of good will and customers, both present and potential[,]" who would turn to competitors constitutes irreparable harm).  As demonstrated by the customer complaints received by KMA, KMA is losing customer good will as a result of (i) not having convenient sales and authorized service available to White Plains customers and (ii) arguably being required (as a result of the stay) to continue listing Lash as an authorized dealer on its website and other listings for consumers, when in fact Lash is no longer doing business as a Kia dealer.  [Dougherty Decl., ¶¶ 22-24 and Exs. G, H and I.]  Before KMA can mitigate these harms by appointing a new dealer for the White Plains market, the statutory stay must be vacated.

In contrast, there is no threat of irreparable harm, imminent or otherwise, to Lash if the stay is lifted.  Lash has chosen to go out of business even though the stay prevents KMA from terminating the Dealer Agreement.  It is now clear that Lash no longer intends to operate as a Kia

13

dealer.  Indeed, Lash's own counsel previously characterized Lash's intended action as a voluntary termination (which would not have triggered the Act's automatic stay).  [Sullivan Aff., ¶¶ 2, 3 and Ex. 1.]

Accordingly, the appropriate and adequate remedy for the wrongs alleged by Lash – i.e., KMA's alleged failure to consent to the sale to Aaronson, and its allegedly wrongful issuance of the notices of termination – is money damages.  There is no reason to stay the termination of the Dealer Agreement when Lash has no intention of continuing to operate as a Kia dealer under that Agreement.

Finally, fundamental principles of equity favor lifting the statutory stay.  Lash deliberately discontinued performance of the Dealer Agreement.  Yet, despite refusing to perform any of its obligations under the Dealer Agreement, the automatic stay requires KMA to continue performing under that same agreement.  "A litigant that seeks equity must do equity."  McNamee, Lochner, Titus & Williams, P.C. v. Higher Educ. Assist. Found., 50 F.3d 120, 125 n.1 (2d Cir. 1995) (law firm that disregarded client's right to discharge it and created conflict of interest was not entitled to equitable remedy of *quantum meruit*).  Lash should not continue to benefit from a statutory stay after rendering its intended purpose moot.

Accordingly, the Court should grant relief from the stay and allow the termination to take effect.

## CONCLUSION

For all of the foregoing reasons, KMA's motion to vacate the statutory stay should be granted.

Dated:  January 17, 2014

>HOGAN LOVELLS US LLP
>
>By:  /s/  John J. Sullivan
>       John J. Sullivan
>       875 Third Avenue
>       New York, New York 10022
>       (212) 918-3000
>
>       Attorneys for Defendant
>       Kia Motors America, Inc.